# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FCSTONE, LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 10-cv-508 |
| SCOTT A. ADAMS, ROBERT W. WALFORD, SAMANTHA GARBERS-ADAMS and LISA WALFORD, | ) ) ) ) |
| Defendants. | ) ) ) |

## AMENDED COMPLAINT

Plaintiff, FCStone, LLC ("FCStone"), by its undersigned attorneys and for its Amended Complaint against Defendants, alleges as follows:

## PRELIMINARY STATEMENT

1.      In its original Complaint, FCStone sought relief against the Defendants (Scott A. Adams ("Adams") and Robert W. Walford ("Walford"), based upon facts demonstrating a straightforward breach of contract. Since the filing of the Complaint, however, shocking additional facts have come to light that evidence a much more egregious pattern of conduct by Adams and Walford. These additional facts reveal blatant and extensive breaches of contract resulting in a failure of performance so substantial as to merit, as an alternative form of relief, rescission of the settlement agreement in question. In particular, FCStone has learned that in addition to the failure of Adams and Walford to pay amounts owing under a settlement agreement resolving their $127,000,000 debt to FCStone, Adams and Walford also failed promptly to file amended tax returns in a concerted effort to deprive FCStone of millions of dollars in tax refunds intended to pay down a portion of their debt. The failure to file these

amended tax returns timely was part of a bad faith scheme by Adams and Walford – in concert with their wives – to test their claimed entitlement to one-half of the tax refund proceeds while retaining leverage over FCStone if their claim was unsuccessful.

## PARTIES

2.     Plaintiff, FCStone, an Iowa limited liability company, is a futures commission merchant with its principal offices located at 141 West Jackson Boulevard, Suite 2650, Chicago, IL 60604.

3.     Defendant, Adams, is an adult individual and resident of the State of New York. Adams is married to Defendant, Samantha Garbers-Adams.

4.     Defendant, Walford, is an adult individual and resident of the State of New York. Walford is married to Defendant, Lisa Walford.

5.     Defendant, Samantha Garbers-Adams, is an adult individual and resident of the State of New York.  Samantha Garber-Adams is married to Adams.

6.     Defendant, Lisa Walford, is an adult individual and resident of the State of New York.  Lisa Walford is married to Walford.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that FCStone is of diverse citizenship from all of the Defendants.  Specifically, FCStone's sole member, FCStone Group, Inc., is a Delaware corporation with its principal place of business in Kansas City, Missouri.  In addition, the amount in controversy, exclusive of costs and interest, exceeds $75,000.

8.     This Court has personal jurisdiction over Defendants, Adams and Walford, in that they transacted business and entered into contractual relationships with FCStone out of its

2

principal place of business in Chicago, IL. In addition, the integrated agreements that form the basis of this action (described more fully herein), explicitly provide that Defendants, Adams and Walford, "agree and consent to the exclusive jurisdiction of the state and federal courts in Illinois" for all disputes arising from or related directly or indirectly to such agreements.

9.      This Court has personal jurisdiction over Defendants, Samantha Garber-Adams and Lisa Walford, in that they are closely related to Adams and Walford, respectively, and have directly benefited from the agreements that form the basis of this action and which explicitly provide for "the exclusive jurisdiction of the state and federal courts in Illinois" for all disputes arising from or related directly to indirectly to such agreements. In addition, Defendants, Samantha Garber-Adams and Lisa Walford, have filed a complaint in New York expressly requesting the court to construe and enter declaratory relief interpreting these same agreements. Finally, Defendants, Samantha Garbers-Adams and Lisa Walford are asserting rights to assets that have been assigned to FCStone pursuant to the referenced agreements, and which would be received at FCStone's principal place of business in Chicago, IL.

10.     Venue is proper in this judicial district in that the agreements that form the basis of this action explicitly provide that the parties consent to venue in any federal court "situated in Cook County, Illinois." In addition, pursuant to 28 U.S.C. § 1391(a)(2), a substantial part of the events or omissions giving rise to the controversy between FCStone and the Defendants occurred within this judicial district.

## FACTS COMMON TO ALL COUNTS

**A.**     **Adams and Walford Accumulate A $127,000,000 Debit Balance.**

11.     Defendants, Adams and Walford, were customers of FCStone and maintained individual and joint trading accounts with FCStone.

3

12.    As a result of transactions in their trading accounts, Adams and Walford, accumulated an account deficit or debit balance of approximately one hundred and twenty-seven million dollars ($127,000,000)(the "Deficit"), which amount was owed to FCStone under their Joint Account Agreement.

13.    Under the Joint Account Agreement governing Adams' and Walford's trading accounts, Adams and Walford are obligated to repay any debit balance to FCStone and FCStone has the right to recover any losses, deficiency or damages from Adams and Walford including the right to institute legal action and collection proceedings against Adams and Walford for the entire Deficit.

14.    Because collection proceedings by FCStone would have subjected virtually all of their assets to levy, turnover or execution – including marital assets owned jointly with their wives –Adams and Walford acknowledged liability to FCStone for the Deficit and requested that FCStone forbear from pursuing its legal rights and remedies to collect the indebtedness resulting from the Deficit.

**B.    Adams and Walford Enter Into A Settlement Agreement With FCStone.**

15.    In consideration of FCStone's forbearance, on March 11, 2009, Adams and Walford each executed:  (i) a Forbearance Agreement; (ii) a Promissory Note in the amount of $127,000,000; and, (iii) an Assignment of Income Tax Refunds (hereinafter, collectively, the "Settlement Agreement").  True and correct copies of the integrated agreements comprising the Settlement Agreement are attached as Exhibits A-C.

16.    The primary purpose of the Settlement Agreement is to provide for FCStone's recoupment of at least a portion of Adams' and Walfords' debt through the assignment and turnover of tax refund proceeds generated by Adams' and Walford's carry back of the trading losses to current and past income tax returns.  The parties anticipated that, by filing current and

4

amended tax returns and carrying back their losses to prior years, Adams and Walford would be entitled to more than $15 Million in tax refund proceeds which would be used to repay FCStone – at least partially.

17.    Pursuant to the Settlement Agreement, Adams and Walford agreed that the full amounts of their anticipated tax refunds would be used to pay down their outstanding debt to FCStone.

18.    The Settlement Agreement provided that Adams and Walford would (a) cause their respective federal, state and local tax returns for 2008 to be prepared and filed, and (b) cause amended tax returns to be prepared and filed for all prior tax years as allowed by law, in order to apply, or carry back, their trading losses so as to maximize tax refunds.

19.    Under the terms of the Settlement Agreement, Adams and Walford agreed that, upon receipt of any tax refund proceeds, two-thirds of such proceeds would be applied as payment on the Promissory Note.  The remaining one-third of any such tax refund proceeds were to be deposited in a new trading account (the "New Trading Account") that was to be established by Adams and Walford and pledged to FCStone to secure payment of their indebtedness.  The Settlement Agreement further provided that at such point as any tax refund proceeds deposited in the New Trading Account totaled five million dollars ($5,000,000), then the full amount of any remaining or additional tax refund proceeds would be applied as payment for the Promissory Note.

20.    Notwithstanding the terms described above in paragraph 19, paragraph 2(e) of the Forbearance Agreement further provided for a one-time "hold back" such that Defendant, Walford, could retain up to six hundred thousand dollars ($600,000) of his federal tax refund for 2008 – but only 2008.

CHIC_4716092.2

21.     The Settlement Agreement further provided that Adams and Walford were required to deliver any tax refund proceeds to FCStone within five (5) business days of receipt of tax refunds.

22.     Pursuant to paragraph 4(c) of the Promissory Note, any failure by either Adams *or* Walford to perform his obligations under the Forbearance Agreement constituted an Event of Default.

23.     Pursuant to paragraph 5 of the Promissory Note, upon the occurrence of an Event of Default, the *entire* unpaid amount of the Promissory Note became immediately and automatically payable, and FCStone was entitled to exercise any and all rights and remedies available to it to collect upon the full indebtedness owed by Adams and Walford.

### C.    Adams And Walford Breached Their Material Obligations Under The Settlement Agreement.

24.     Under the Settlement Agreement, Adams and Walford had three primary and threshold obligations to FCStone:

      a.    the duty to seek all tax refunds allowed by law by "properly and timely" filing tax returns or amended tax returns;

      b.    the duty to pay over to FCStone within five (5) business days the required amount of any tax refund proceeds they received; and

      c.    the duty to establish the New Trading Account in a manner acceptable to FCStone and immediately deposit the requisite amount of any tax refund proceeds into such account.

As set forth below, Adams and Walford have failed to perform any of these material obligations as required by the Settlement Agreement.

25.     First, on or about October 23, 2009, Walford received a New York state tax refund for 2008 in the amount of $305,784. On or about November 13, 2009, Walford received a federal tax refund for 2008 in the amount of $843,846. Despite his obligation under the

6

Settlement Agreement, Walford failed to pay to FCStone any amount of the 2008 New York state and federal tax refunds to which it is entitled within five (5) business days. In fact, Walford failed to pay any amount owed by the time of the filing of the original Complaint in this action, almost three (3) months later. In fact, Walford did not even advise FCStone that he had received the 2008 New York state and federal tax refunds until on or about December 3, 2009 – a month after he was already in default. Notably, Walford only informed FCStone of the dates upon which he received the 2008 New York state and federal tax refunds following the commencement of this litigation and after repeated demands from FCStone's counsel.

26.    Second, Adams and Walford failed to establish the New Trading Account required under the Settlement Agreement. In addition, Walford failed to deposit one-third of the proceeds from his 2008 New York state and federal tax refund in such a New Trading Account as required by the Settlement Agreement.

27.    Third, FCStone only recently learned that, by the time of the filing of the original Complaint in this action, both Adams and Walford had failed or refused to file any amended tax returns for the years 2005 through 2007 – a blatant violation of a key provision of the Settlement Agreement. In fact, it was only after being sued by FCStone in this action that Adams and Walford finally filed those amended tax returns for the purpose of obtaining the anticipated tax refunds. Specifically, Adams and his wife, Samantha Garbers-Adams, only filed amended tax returns for 2005-2007 on March 4, 2010. Walford and his wife, Lisa Walford, only filed amended tax returns for 2005-2007 on March 9, 2010. By deliberately failing or refusing to file those amended tax returns, Adams and Walford deprived FCStone of the receipt, use and benefit of any of the tax refund proceeds for at least half a year.

CHIC_4716092.2

**D.**     **The Defendants' Untenable Interpretation of the Settlement Agreement.**

28.     Despite the parties' express intent in the Settlement Agreement that FCStone receive the benefit of the full amount of any tax refunds generated by the trading losses of Adams and Walford, the Defendants now contend that Samantha Garbers-Adams and Lisa Walford are entitled to one-half of any such tax refund proceeds.

29.     With respect to Walford's 2008 federal tax refund, therefore, Walford claims that his wife is entitled to keep one-half of the $843,846 proceeds, or $421,923.  Walford further claims that he is entitled to retain the remaining one-half (i.e., $421,923) pursuant to the "hold-back" provision in the Settlement Agreement.

30.     With respect to the 2008 New York state tax refund in the amount of $305,784, Walford again claims that his wife, Lisa Walford, is entitled to one-half of the proceeds, or $152,982.  Even under Walford's asserted position, however, Walford was still obligated to pay FCStone two-thirds of the remaining one-half of the 2008 New York state tax refund (i.e., $101,928), no later than October 30, 2009.  While FCStone vigorously disputes that it is only owed this amount of the 2008 New York state tax refund, as of the date it commenced this lawsuit, Walford had not paid *even this undisputed amount* to FCStone.

31.     Adams and his wife, Samantha Garbers-Adams, also contend that she is entitled to keep one-half of any tax refund received for 2008 and prior years resulting from Adams' trading losses.

32.     The Defendants' position that the Settlement Agreement contemplates that Adams and Walford only agreed to assign one-half of the tax refund proceeds to FCStone contradicts the language of the Agreement, defies common sense and is belied by the Defendants' own conduct.

33.     First, under their Joint Account Agreement, Adams and Walford had already agreed, without qualification, to indemnify FCStone for their *entire* debit balance of $127

8

Million. FCStone did not intend or agree to allow Samantha Garbers-Adams and Lisa Walford

(and, by implication, their husbands and co-habitants Scott Adams and Robert Walford) to profit

in the amount of approximately $7.5 Million from tax refunds that were solely derived from or

generated by the huge trading losses incurred by their husbands (who had already agreed to

repay the entire debit balance) and covered by FCStone (to its severe economic detriment).  If

retained by Samantha Garbers-Adams and Lisa Walford, those proceeds will also benefit their

spouses, Adams and Walford, directly as joint marital assets.  In the event that Samantha

Garbers-Adams and Lisa Walford retain $7.5 Million from these tax refunds, they and their

husbands will have received a huge financial windfall that is solely derived from the enormous

loss which the husbands themselves caused and which FCStone alone paid for.  The parties to

the Settlement Agreement did not intend or agree to such an absurd or nonsensical arrangement.

   34.  Second, the conduct of the Defendants is unintentionally revealing and reflects

their actual understanding that, pursuant to the Settlement Agreement, Adams and Walford had

assigned to FCStone the *entire proceeds* of any tax refunds received due to the trading losses of

Adams and Walford (except for the one-time exception of the 2008 hold-back of $600,000).  If

the Defendants truly believed that the Settlement Agreement allowed Samantha Garber-Adams

and Lisa Walford to retain one-half of the tax proceeds – almost $7.5 Million – then the

Defendants (a) had a compelling economic incentive to file their amended tax returns without

delay and reap their $7.5 Million share of the refunds and (b) would have filed their 2005-2007

amended tax returns many months earlier.  Instead, the Defendants deliberately withheld from

filing the amended tax returns for many months and concealed the fact that they had, in fact, not

filed them.  Instead, it was only after this litigation was commenced and FCStone's counsel

CHIC_4716092.2

demanded information as to the amended tax returns that Defendants finally filed their amended

tax returns for tax years 2005-2007.

35.    It is now apparent that the Defendants have engaged in a bad faith course of

conduct which was designed to create a fake "controversy" between Samantha Garbor-Adams

and Lisa Walford on the one hand, and their husbands on the other hand, over their respective

"rights" to the tax refunds in question.  In an effort to circumvent the Settlement Agreement - -

including its forum selection clause - - Samantha Garber-Adams and Lisa Walford filed suit

against their husbands in New York state court as though they were "adversaries".  In truth and

in fact, Mr. and Mrs. Adams and Mr. and Mrs. Walford have precisely the same economic

interests and are acting in concert.  According to their original scheme, if the Defendants were

unsuccessful in their suit in New York, then, on information and belief, Samantha Garbers-

Adams and Lisa Walford, with Scott Adams' and Robert Walford's complicity, intended to

refuse to sign the amended tax returns and the Defendants would use their refusal as leverage to

negotiate a more favorable arrangement with FCStone.  FCStone's filing of this suit for breach of

contract truncated the Defendants' scheme.

## <u>Count I</u>
### (Breach of Contract As Against Walford)

36.    FCStone restates and realleges paragraphs 1 through 35 as though fully set forth

herein.

37.    Defendant, Walford, breached and has anticipatorily breached and repudiated his

obligations under the Settlement Agreement in the following respects:

      a.    failing to pay to FCStone within five (5) business days – or at any time,
for that matter –the amounts to which FCStone is entitled from the 2008
federal tax refund;

10

b.    failing to pay to FCStone within five (5) business days—or at any time, for that matter – the amounts to which FCStone is entitled from the 2008 New York state tax refund;

c.    failing to pay FCStone within five (5) business days the undisputed sum of $101,928 that is due and owing to FCStone as a result of the 2008 New York state tax refund even accepting the position taken by Walford (which sum is part of the amount of the 2008 New York state tax refund to which FCStone asserts it is entitled under (b), above);

d.    failing to establish the New Trading Account and failing to deposit any portion of the 2008 federal or New York state tax refund into the New Trading Account;

e.    failing to file the amended tax returns for the years 2005-2007 as required by and pursuant to the terms of the Settlement Agreement;

f.    asserting that his wife, Lisa Walford, is entitled to one-half of each tax refund received or to be received for 2009 and all prior years in direct contravention of the terms of the Settlement Agreement.

38.    The above-described breaches of the Forbearance Agreement, separately and collectively, constitute an Event of Default pursuant to paragraph 4(c) of the Promissory Note.

39.    As a result of the Event of Default, all amounts owing under the Promissory Note are immediately and automatically due and payable to FCStone. The amount currently due and payable to FCStone under the Promissory Note is one hundred and twenty-seven million dollars ($127,000,000), plus accrued interest at the rate of 1.94% per annum.

40.    As a result of the failure of Walford to pay to FCStone the amounts due and payable under the Promissory Note, FCStone has been damaged in the amount of one hundred and twenty-seven million dollars ($127,000,000), plus accrued interest at the rate of 1.94% per annum.

41.    Pursuant to paragraph 9 of the Promissory Note, FCStone is entitled to an award of all expenses, including reasonable attorneys' fees and court costs, incurred in enforcing its rights under the Promissory Note.

WHEREFORE, Plaintiff, FCStone, LLC, requests that this Court enter a judgment in its favor and against Defendant, Robert W. Walford, for the following:

    (i)    the sum of one hundred and twenty-seven million dollars ($127,000,000), plus accrued interest at the rate of 1.94% per annum;

    (ii)    all costs, including reasonable attorneys' fees and court costs, incurred in enforcing its rights under the Settlement Agreement; and

    (iii)    any further relief the Court deems just and equitable.

## Count II
### (Breach of Contract As Against Adams)

42.    FCStone restates and realleges paragraphs 1 through 41 as though fully set forth herein.

43.    The above-described breaches of the Forbearance Agreement by Defendant, Walford, separately and collectively, constitute an Event of Default as to Defendant, Adams, pursuant to paragraph 4(c) of the Promissory Note.

44.    In addition, Adams has anticipatorily breached and repudiated the Forbearance Agreement by asserting that his wife is entitled to one-half of each tax refund for 2009 and all prior years in direct contravention of the terms of the Settlement Agreement. This anticipatory breach and repudiation of the Forbearance Agreement by Scott Adams constitutes an additional Event of Default pursuant to paragraph 4(c) of the Promissory Note.

45.    As a result of the Event of Default, all amounts owing under the Promissory Note are immediately and automatically due and payable to FCStone. The amount currently due and payable to FCStone under the Promissory Note is one hundred and twenty-seven million dollars ($127,000,000), plus accrued interest at the rate of 1.94% per annum.

46.    As a result of the failure of Adams to pay to FCStone the amounts due and payable under the Promissory Note, FCStone has been damaged in the amount of one hundred

CHIC_4716092.2

and twenty-seven million dollars ($127,000,000), plus accrued interest at the rate of 1.94% per annum.

47.     Pursuant to paragraph 9 of the Promissory Note, FCStone is entitled to an award of all expenses, including reasonable attorneys' fees and court costs, incurred in enforcing its rights under the Promissory Note.

WHEREFORE, Plaintiff, FCStone, LLC, requests that this Court enter a judgment in its favor and against Defendant, Scott Adams, for the following:

(i)     the sum of one hundred and twenty-seven million dollars ($127,000,000), plus accrued interest at the rate of 1.94% per annum;

(ii)    all costs, including reasonable attorneys' fees and court costs, incurred in enforcing its rights under the Settlement Agreement; and

(iii)   any further relief the Court deems just and equitable.

### Count III
### (Declaratory Judgment As Against All Defendants)

48.     FCStone restates and realleges paragraphs 1 through 47 as though fully set forth herein.

49.     Based upon the above allegations, an actual case or controversy exists between FCStone and Defendants, Adams and Samantha Garbers-Adams.  Specifically, Adams and Samantha Garbers-Adams contend that Samantha Garbers-Adams is entitled to one-half of each tax refund received or to be received by them as a result of losses incurred by Adams in his trading accounts maintained at FCStone.  FCStone asserts that the full amount of any such tax refund for 2008 or prior years was assigned by Adams to FCStone and is required to be applied to the indebtedness of Adams to FCStone as provided by the terms of the Settlement Agreement.

50.     Based upon the above allegations, an actual case or controversy exists between FCStone and Defendants, Walford and Lisa Walford.  Specifically, Walford and Lisa Walford

13

contend that Lisa Walford is entitled to one-half of each tax refund received or to be received by them as a result of losses incurred by Walford in his trading accounts maintained at FCStone. FCStone asserts that the full amount of any such tax refund for 2008 or prior years was assigned by Walford to FCStone and is required to be applied to the indebtedness of Walford to FCStone as provided by the terms of the Settlement Agreement.

51.    Defendants, Adams and Samantha Garbers-Adams have conspired in bad faith to breach the Settlement Agreement in order to deprive FCStone of the basis of its bargain and the assets to which it is entitled under the Settlement Agreement.  Accordingly, in order to protect FCStone's interest in such assets, FCStone is entitled to the imposition of a constructive trust on the proceeds of any tax refunds received by Adams or Samantha Garbers-Adams for 2008 and all prior years.

52.    Defendants, Walford and Lisa Walford have conspired in bad faith to breach the Settlement Agreement in order to deprive FCStone of the basis of its bargain and the assets to which it is entitled under the Settlement Agreement.  Accordingly, in order to protect FCStone's interest in such assets, FCStone is entitled to the imposition of a constructive trust on the proceeds of any tax refunds received by Walford or Lisa Walford for 2008 and all prior years.

WHEREFORE, Plaintiff, FCStone, LLC, requests that this Court enter a judgment in its favor and against the Defendants:

      (i)    declaring that Samantha Garbers-Adams is not entitled to retain one-half of any tax refund received by Scott Adams and/or Samantha Garbers-Adams for 2008 or prior years, and that any such tax refunds must be applied to the indebtedness of Scott A. Adams to FCStone as provided in the Forbearance Agreement, Promissory Note and Assignment of Income Tax Refunds;

      (ii)    declaring that Lisa Walford is not entitled to retain one-half of any tax refund received by Robert Walford and/or Lisa Walford for 2008 or prior years, and that any such tax refunds must be applied to the indebtedness of

14

Robert W. Walford to FCStone as provided in the Forbearance Agreement, Promissory Note and Assignment of Income Tax Refunds;

(iii)    imposing a constructive trust for the benefit of FCStone on any tax refunds received or to be received by Scott A. Adams and/or Samantha Garbers-Adams for 2008 or earlier years;

(iv)    imposing a constructive trust for the benefit of FCStone on any tax refunds received or to be received by Robert W. Walford and/or Lisa Walford for 2008 or earlier years;

(v)    any further relief the Court deems just and equitable.

<u>**Count IV**</u>
**(Rescission As Against Adams and Walford)**

53.    FCStone restates and realleges paragraphs 1 through 52 as though fully set forth herein.

54.    The deliberate and extensive breaches of the Settlement Agreement set forth herein constitute a substantial nonperformance by Adams and Walford and result in a failure of the consideration bargained for by FCStone.

55.    As a result of the substantial nonperformance and failure of consideration, FCStone is entitled to rescind the Settlement Agreement and proceed against Adams and Walford under the account agreements governing their joint trading accounts.

WHEREFORE, in the alternative to the relief sought in Counts I and II herein, FCStone requests that this Court enter a judgment in its favor and against Defendants, Adams and Walford, for the following:

(i)    rescission of the Settlement Agreement;

(ii)    any further relief the Court deems just and equitable.

15

## COUNT V
### (Breach of Joint Account Agreements As Against Adams and Walford)

56.     FCStone restates and realleges paragraphs 1 through 55 as though fully set forth herein.

57.     The trading accounts maintained at FCStone by Adams and Walford were governed by a Joint Customer Account Agreement executed by Adams and Walford on or about April 15, 2007 (the "Joint Account Agreement"). A true and correct copy of the Joint Account Agreement is attached as Exhibit D.

58.     Pursuant to the Joint Account Agreement, FCStone was authorized in its sole discretion to liquidate any positions in the accounts maintained by Adams and Walford if "for any reason whatsoever, [FCStone] deems itself insecure or if necessary for [FCStone's] protection ...". In the fall of 2008, FCStone liquidated the accounts or Adams and Walford pursuant to the terms of the Joint Account Agreement.

59.     As alleged herein, the liquidation of the trading accounts of Adams and Walford resulted in the Deficit in the approximate amount of $127,000,000.

60.     Adams and Walford have acknowledged liability for the Deficit.

61.     Paragraph 5 of the Joint Account Agreement provides that Adams and Walford:

> Agree[] to indemnify [FCStone] and hold [FCStone] harmless from any and all liabilities, losses, damages, costs and expenses, including accountants' and attorneys' fees incurred, directly or indirectly, by [FCStone] ... from any action or omission by [Adams or Walford] with respect to the account(s), including but not limited to, any debit or deficit balances which may occur in [Adams' and Walford's] account ...

62.     Adams and Walford have failed to pay the amounts owing to FCStone as a result of the Deficit.

63.     FCStone has been damaged in an amount not less than $127,000,000.

16

64.     Paragraph 5 of the Joint Account Agreement further provides that FCStone is entitled to "interest on any debit or deficit balances" calculated from the date on which the Deficit first existed and at a fluctuating rate equal to one percent plus the prime rate of interest published in the *Wall Street Journal*.

WHEREFORE, in the alternative to the relief sought in Counts I and II herein, FCStone requests that this Court enter a judgment in its favor and against Defendants, Adams and Walford, for the following:

(i)     the sum of one hundred twenty-seven million dollars ($127,000,000), plus interest as specified in the Joint Account Agreement;

(ii)    all costs, including reasonable accountants' and attorneys' fees, incurred in enforcing its rights under the Joint Account Agreement;

(iii)   any further relief the Court deems just and equitable.

DATED:  March 24, 2010                     Respectfully submitted,


                                           s/ Thomas R. Mikrut
                                           Stephen P. Bedell (Attorney No. 3125972)
                                           Dean M. Jeske (Attorney No. 6201378)
                                           Katherine E. Licup (Attorney No. 6288355)
                                           Thomas R. Mikrut (Attorney No. 6290232)
                                           Foley & Lardner LLP
                                           321 North Clark Street
                                           Suite 2800
                                           Chicago, IL  60654
                                           312.832.4500

                                           *Attorneys for Plaintiff,*
                                           *FCStone, LLC*

17

CHIC_4716092.2

## CERTIFICATE OF SERVICE

I, Thomas R. Mikrut, an attorney, on oath state that on March 24, 2010, I caused a true

and correct copy of the foregoing Amended Complaint to be filed via the Court's ECF system,

and provided notice via electronic mail to the following attorneys:

Michael R. Koblenz
Mound Cotton Wollan & Greengrass
One Battery Park Plaza
New York, NY  10004-1486
mkoblenz@moundcotton.com
*Attorney for Lisa Walford and*
*Samantha Garbers-Adams*

Mark Skolnick
Platzer, Swergold, Karlin, Levine,
  Goldberg & Jaslow, LLP
1065 Avenue of the Americas
New York, NY  10018
mskolnick@platzerlaw.com
*Attorney for Robert Walford and*
*Scott Adams*

Kurt Stitcher
Amy Alison Pines
Levenfeld Pearlstein, LLC
2 N. LaSalle Street, Suite 1300
Chicago, IL  60602
kstitcher@lplegal.com
apines@lplegal.com

*Attorneys for Samantha Garbers-Adams and*
*Lisa Walford*

s/ Thomas R. Mikrut
Attorney Plaintiff FCStone, LLC

CHIC_4716092.2

# Exhibit A

Execution Version

## FORBEARANCE AGREEMENT

Agreement by and among FCStone, LLC ("FCStone") and Scott A. Adams ("Adams") and Robert W. Walford ("Walford") dated March 11, 2009.

RECITALS:

A.    FCStone, an Iowa limited liability company, is a futures commission merchant having offices at 141 West Jackson Blvd., Suite 2650, Chicago, IL 60604.

B.    Adams and Walford have been customers of FCStone under the terms governing their individual and joint accounts including those listed in Exhibit 1 attached hereto (the "Existing Trading Accounts").

C.    Adams and Walford entered into transactions in the Existing Trading Accounts, which have resulted in an account deficit as of this date that is in the approximate amount of one hundred twenty-seven million dollars ($127,000,000) (the "Deficit") owed by Adams and Walford to FCStone.  In view of such Deficit FCStone has exercised its rights to liquidate the Existing Trading Accounts by transfer to, and assumption by, a successor firm of almost all of the remaining positions.

D.    Adams and Walford acknowledge liability for the Deficit, but have requested that forbearance from collection be granted by FCStone.  FCStone is willing to grant forbearance under the terms herein provided.

NOW THEREFORE, the Parties agree as follows:

1.    Adams and Walford hereby acknowledge liability to FCStone in the total amount of one hundred twenty-seven million dollars ($127,000,000) free and clear of all claims and defenses plus or minus an adjustment amount reflecting the actual deficit which shall be computed by FCStone after all positions in the Existing Trading Accounts have been fully transferred or liquidated (the "Deficit Liability"). The final Deficit Liability shall be determined by FCStone within a reasonable time after all positions in the Existing Trading Account have been fully transferred or liquidated, and notice of such amount and an accounting therefor shall be provided to Adams and Walford. Adams shall bear one-half of such liability and Walford shall bear one-half of such liability.

2.    Contingent upon Adams and Walford performing all of their obligations under this Agreement, FCStone shall forbear from collection of the Deficit Liability, and in exchange for such forbearance, and in place of the liability thereon the parties agree that:

            (a) Adams and Walford shall execute and deliver to FCStone a promissory note dated March 11, 2009, payable to the order of FCStone in the amount one hundred twenty-seven million dollars ($127,000,000), subject to adjustment as



1

Execution Version

provided in Section 1 of this Agreement ("Note") in the form attached hereto, and the Note shall bear interest and shall be payable as provided therein; and

(b)  Adams and Walford shall cause their federal, state and local tax returns for the current tax year to be prepared, and shall amend all prior tax returns as allowed by law to carry back losses. Copies of all returns and amended returns will be submitted to FCStone by Adams and Walford immediately upon filing.

(c)  Adams and Walford shall seek all reasonable federal, state, and city tax refunds available to them under reasonable and proper application of law and regulations and shall cause such tax refunds to be applied in accordance with the terms of this Agreement. Adams and Walford shall execute assignments of tax refunds contemporaneously herewith (the "Assignments"). The Assignments shall secure payment of the Note. Adams and Walford shall cause each refund payment to be paid and applied as provided in this Agreement and the Assignments.

(d)  Adams and Walford shall establish a new trading account at a firm other than FCStone selected by Walford and Adams that is acceptable to FCStone in its sole discretion (the "New Trading Account"). Adams and Walford shall be the owners of the New Trading Account, but it shall be pledged to FCStone to secure payment of the Note. The Parties and the selected firm shall execute such documents as FCStone may require that grant and establish a fully perfected security interest in favor of FCStone to secure payment of the Note. Walford and Adams shall cause duplicate statements of activity in the New Trading Account to be provided to FCStone on a daily basis. For so long as the Note remains outstanding the New Trading Account shall be the sole commodity trading account maintained or traded by Adams or Walford. If Walford and Adams so request, FCStone will authorize Walford and Adams to engage in commodity trading with a firm other than FCStone between the date of this Agreement and the date trading commences in the New Trading Account provided that Walford and Adams shall cease such trading on the date trading commences in the New Trading Account, shall report Net Trading Gains thereon to FCStone on a monthly basis, and shall remit one-half of the total of such gains to FCStone within a reasonable time after trading commences in the New Trading Account taking into account the time required to close out positions. Except as set forth in this Agreement, neither Walford nor Adams shall be required to make any contribution to the New Trading Account.

(e)  Subject to the last three sentences of this Section 2(e), upon receipt of funds representing tax refunds, two-thirds of each payment shall be applied as payment on the Note, and the remaining one-third shall be deposited in the New Trading Account, after it is established and has been fully pledged to FCStone as provided in Section 2(d), until a total of $5.0 million shall be deposited in the New Trading Account. All tax refund proceeds in excess of $5.0 million that have been deposited in the New Trading Account shall be applied to the Note. The

2

Execution Version

foregoing not withstanding, Walford shall be entitled to retain or shall be paid the sum of six hundred thousand dollars ($600,000) from his federal tax refund for 2008. With respect to any State or City tax refund which Walford or Adams is required to recognize as income for federal tax purposes in the year of receipt, the estimated amount of additional federal tax required to be paid by Walford or Adams that is attributable to such State or City tax refund shall be paid to each before application of the refunds as set forth above. After the tax returns for the year of receipt of such refunds are filed by Walford and Adams, the Parties shall make a withdrawal or deposit from or to the New Trading Account in the amount required so that the actual amount paid into the New Trading Account for State and City refunds is net of federal tax.

(f)    After deposit of tax refund proceeds to the New Trading Account:

(i)  Adams and Walford shall be authorized to trade in the New Trading Account from and after the deposit of funds as herein provided. As used herein "Net Trading Gains" shall mean any gains less trading expenses consisting of brokerage, exchange fees and other such direct costs of trading. The parties shall exchange an acknowledgement of the date trading in the New Trading Account first commences.

(ii)  One-half of all Net Trading Gains in the New Trading Account shall be withdrawn out of the New Trading Account and applied as payment on the Note on the last business day of each calendar year.

(iii)  So long as Adams and Walford are not in default under the Note, they shall be entitled to withdraw or to retain one-half of the Net Trading Gains of the New Trading Account as of the last business day of each calendar year, provided that no distribution shall be paid to Adams and Walford that would reduce the New Trading Account trade equity below $5.0 million at any time.

(iv)  The New Trading Account shall be closed on the date which is one day less than five years after trading the New Trading Account first commences. On such date one-half of the trade equity, after deduction, and payment to Adams and Walford of any unpaid Net Trading Gains due them shall be applied against the Note.

(g)    Adams and Walford shall each submit a net worth statement to FCStone on or before March 20, 2009. Such net worth statement shall be prepared by an accountant selected by each, shall exclude the principal residence and mortgage liabilities thereon of each and shall reflect all assets at fair value and shall otherwise be true, correct and complete. If either such net worth statement reflects a net worth, excluding asset value and mortgage liabilities of his principal residence, that exceeds $5 million, then such person agrees that he will liquidate

3

Execution Version

assets in an amount equal to the excess net worth above $5 Million and apply proceeds against the Note within ninety days of the date of this Agreement

(h)    In the event that any portion of any refund amount actually applied by FCStone to the Note and actually paid into the New Trading Account is found on re-examination or audit to be required to be repaid by Walford or Adams, the amount required to be repaid shall be restored to Walford or Adams one third from the New Trading Account and two thirds from FCStone, provided that the right of  restoration shall not apply unless the party subject to audit or reexamination shall give prompt notice to FCStone of the commencement of any such audit or reexamination.

3.    Upon execution of this Agreement, Adams and Walford and their respective successors and assigns (the "Releasors"), for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, hereby fully, forever, irrevocably and unconditionally release, remise, acquit and discharge FCStone and its parents, subsidiaries, predecessors, successors, principals, employees, agents, officers, directors, managers, employees and clients (the "Releasees") from any and all claims, charges, complaints, demands, actions, causes of action, suits, rights, appeals and rights of appeal, debts, dues, sums of money, costs, losses, accounts, reckonings, covenants, contracts, controversies, agreements, promises, leases, omissions, damages, executions, obligations, liabilities, and expenses (including attorneys' fees and costs) of every kind, nature and description whatsoever, existing or contingent, ascertained or unascertained, asserted or unasserted, suspected or unsuspected, in law, equity or mixed, that the Releasors ever had, now have or hereafter can, shall or may have against the Releasees, by reason of, on account of, or arising out of the Deficit or any transactions effected in the Existing Trading Accounts at FCStone, through the date of this Agreement (the "Released FCStone Claims"). Notwithstanding the above, the Released FCStone Claims shall not include the obligations of FCStone to Adams and Walford under the terms of the Note, the New Trading Account and this Agreement.

4.    Upon execution of this Agreement, FCStone and its respective subsidiaries, predecessors, successors, principals, employees and agents (FCStone and its Affiliates"), for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, hereby fully, forever, irrevocably and unconditionally release, remise, acquit and discharge Adams and Walford and their respective successors and assigns from any and all claims, charges, complaints, demands, actions, causes of action, suits, rights, appeals and rights of appeal, debts, dues, sums of money, costs, losses, accounts, reckonings, covenants, contracts, controversies, agreements, promises, leases, omissions, damages, executions, obligations, liabilities, and expenses (including attorneys' fees and costs) of every kind, nature and description whatsoever, existing or contingent, ascertained or unascertained, asserted or unasserted, suspected or unsuspected, in law, equity or mixed, that FCStone and its Affiliates ever had, now have or hereafter can, shall or may have against Adams and Walford, by reason of, on account of, or arising out of the Deficit or any transactions effected in the Existing Trading Accounts at FCStone through the date of this Agreement (the "Released Adams and Walford Claims").  Notwithstanding the

4

Execution Version

above, the Released Adams and Walford Claims shall not include the obligations of Adams and Walford to FCStone under the terms of the Note, the New Trading Account, the assignments by Adams and Walford of tax refunds and this Agreement. FCStone shall take reasonable steps to assure Walford and Adams that they will not be subjected to claims by Commodity Operations, Inc on account of matters arising in the Existing Trading Accounts within a reasonable time after the date of this Agreement.

5.    FCStone and Adams and Walford agree and understand that this Agreement effects the settlement of claims and the fact that this Agreement has been executed shall not constitute, be offered as, be received as, be deemed as, or be construed as an admission by any party of any kind of liability except as otherwise stated herein.

6.    Each Party represents and warrants that no statements or representations made by another Party, except as specifically recited in this Agreement and in the Note, have influenced, induced or caused it to execute this Agreement, or were relied upon in entering this Agreement.

7.    This Agreement may be signed in counterpart via facsimile transmission or electronic mail. Each Party represents that it is duly authorized to enter into this Agreement and does not require the consent of any other person to enter into this Agreement.

8.    This Agreement shall be governed and construed in accordance with the laws of Illinois without regard to its conflicts of laws provisions. The Parties each agree and consent to the exclusive jurisdiction of the state and federal courts in Illinois, in all actions, proceedings and litigation arising from or related directly or indirectly to this Agreement. All previously executed agreements for arbitration are cancelled and shall be deemed waived as of this date.

9.    FCStone may make such announcement of the financial impact of this Agreement as it, in its sole discretion, may determine to be appropriate and shall make such disclosure of this Agreement in filings with the Securities and Exchange Commission as its professional advisors may advise. In disclosures with the Securities and Exchange Commission FCStone shall seek confidential treatment of the information filed to the extent deemed consistent with law and regulation by FCStone's professional advisers. This Agreement shall otherwise be kept confidential by the Parties to the extent reasonably possible, except for disclosure to relevant professional advisors, to regulatory bodies, to lenders on a confidential basis, or as may be required by law.

10    The liability of Walford and Adams to FCStone from and after this date shall be as stated in this Agreement, the Note, and in the documents which relate to security for the Note.

11.    Neither Walford or Adams, nor FCStone shall make any voluntary public statement or announcement that is disparaging of the other, provided that this shall not prohibit any disclosure that any party is required by law to make.

5

Execution Version

12.  The term of the Agreement shall commence on the date hereof and shall end on the closure of the New Trading Account.

13.  To the extent any Party can at no cost to himself or itself, and without adversely affecting any of his or its material rights, each Party will cooperate with the others to obtain favorable tax treatment in connection with the matters contemplated herein.

14.  Notwithstanding the foregoing, Adams and Walford shall be entitled to retain any market maker rebates paid or credited with respect to all exchange, brokerage and other trading fees incurred in connection with their trading activities in the Existing Trading Accounts, without any offset or deduction by FCStone to defray their outstanding brokerage charges.

IN WITNESS WHEREOF, the Parties have executed this instrument as of the _____ day of March, 2009.

IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.

FCSTONE, LLC

By: _____

Its: _____

6

Execution Version

12.    The term of the Agreement shall commence on the date hereof and shall end on the closure of the New Trading Account.

13.    To the extent any Party can at no cost to himself or itself,  and without adversely affecting any of his or its material rights, each Party will cooperate with the others to obtain favorable tax treatment in connection with the matters contemplated herein.

14.    Notwithstanding the foregoing, Adams and Walford shall be entitled to retain any market maker rebates paid or credited with respect to all exchange, brokerage and other trading fees incurred in connection with their trading activities in the Existing Trading Accounts, without any offset or deduction by FCStone to defray their outstanding brokerage charges.

IN WITNESS WHEREOF, the Parties have executed this instrument as of the _11_ day of March, 2009.

**IMPORTANT:  READ BEFORE SIGNING.  THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED.   YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

FCSTONE, LLC

By _____

Its _____

6

Execution Version

SCOTT A. ADAMS

Execution Version

_____
ROBERT W. WALFORD

8

Execution Version

# Exhibit 1

## Existing Trading Accounts

FCStone Accounts:  95250
95251
95252
95253
95255
95256
95257
95258
95259

5

FORM OF NOTE

# Exhibit B

ExecutionVersion

PROMISSORY NOTE

(US) $127,000,000)

March 11, 2009

FOR VALUE RECEIVED, Scott A. Adams ("Adams") and Robert W. Walford ("Walford") each unconditionally promises to pay to the order of FCStone, LLC, an Iowa limited liability company ("Payee") at 141 West Jackson Blvd, Suite 2650, Chicago, IL 60604, or at such other place or places as Payee may from time to time designate in writing, the principal sum of one hundred twenty-seven million United States dollars (U.S. $127,000,000) subject to adjustment as provided in Section 11.

1.    Interest.  The unpaid principal balance hereof shall bear interest, computed on the basis of a 365-day year for the actual number of days elapsed, at the rate equal to 1.94 per cent per annum compounded annually.

2.    Payment.  Tho principal balance of this Note shall be repaid in full on or before the date (the "Maturity Date") which is one day less than five years from the date trading commences in the New Trading Account under the forbearance agreement by and among Adams, Walford and Payee dated March 11, 2009, (the "Forbearance Agreement"); provided, however, that the principal balance shall be subject to adjustment as provided in Section 11. The principal balance of this Note, together with all accrued and unpaid interest on the principal balance, shall be paid on or before the Maturity Date; provided, however, that the principal balance and all accrued and unpaid interest shall be subject to adjustment as provided in Section 11.

3.    Prepayment.  This Note may be prepaid in whole or part without penalty. All payments hereunder shall be applied first to interest on the unpaid balance at the rate herein specified and then to principal. Payments of principal and interest hereunder are to be made in lawful money of the United States of America and in immediately available funds.

4.    Event of Default.   Each of the following shall be considered an Event of Default under this Note: (a) any failure of either Adams or Walford to pay the principal or interest on this Note when due; (b) either Adams or Walford shall generally not pay his debts as such debts become due, or shall admit in writing his inability to pay his debts generally, or shall make a general assignment for the benefit of creditors; any proceeding shall be instituted by or against either Adams or Walford seeking to adjudicate him a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, custodianship, protection, relief, or composition of him or his property, and such proceedings shall not be dismissed within one hundred twenty (120) days after its commencement; or either Adams or Walford shall take any action to authorize any of the actions set forth above in this part (b); and (c) any failure by Adams or  Walford to perform his obligations under the Forbearance Agreement. Notwithstanding the foregoing, no Event of Default shall be deemed to occur under subsection (a) or subsection (b) unless and until Payee shall have given written notice of such default and Walford and Adams shall fail to cure such default within ten days of such notice.

5.    Remedy.  Upon the occurrence of any Event of Default hereunder that if curable is not cured within the time allowed under Section 4, immediately and automatically, (a) the entire unpaid amount of all this Note shall become immediately due and payable without presentment, demand, notice or legal process of any kind; (b) Payee may, at its option, without demand, notice or legal process of any kind, exercise any and all rights and remedies granted to it hereunder and under the Confession of Judgment of Adams and Walford as set forth in Section 6 below herewith; and (c) Payee may at its option exercise from time to time any other rights and remedies available to it under the Uniform Commercial Code or other law of the State of Illinois.

6.    Confession of Judgment.  To secure their payment obligation, Adams and Walford, upon the occurrence of an Event of Default as set forth in Section 4 that if curable is not cured within the time allowed by Section 4, irrevocably authorize any attorney of any court of record to appear for Payee, in term time or vacation, and confess a judgment against Adams and Walford, without process (except as expressly required by applicable law), in favor of Payee, for such amount as may remain unpaid on this Promissory Note, together with costs of suit and attorneys' fees incurred after the execution of this confession of judgment, to the full amount allowed by law , and to waive and release all errors which may intervene in any such proceedings and consent to an immediate execution upon the judgment and waive all right of appeal.



-1-

7.    Right of Setoff.  Upon the occurrence and during the continuance of an Event of Default, Adams and Walford waive the benefit of any law that would otherwise restrict or limit Payee in the exercise of its right, which is hereby acknowledged, to set off at any time hereafter any liabilities, property, or indebtedness owing from Payee to Adams and Walford. Adams and Walford shall have no right to set off any amounts due hereunder against any (i) liabilities or indebtedness of Payee held by Adams and Walford or (ii) claims Adams and Walford may have against Payee of any kind or nature.

8.    Waiver of Presentment.  Adams and Walford waive presentment, demand and protest, notice of protest, notice of presentment and all other notices and demands in connection with the enforcement of Payee's rights hereunder, except as specifically provided and called for by this Note, and hereby consent to, and waive notice of, the release with or without consideration of any guarantor of Adams and Walford or of any collateral. Any failure of Payee to exercise any right available hereunder or otherwise shall not be construed as a waiver of the right to exercise the same or as a waiver of any other right at any other time. Without affecting the liability of any maker, endorser, surety or guarantor, Payee may, without notice, grant renewals or extensions, accept partial payments or agree not to sue any party liable on this Note.

9.    Expenses.  Upon the occurrence of an Event of Default Adams and Walford agree to pay all expenses, including, but not limited to, reasonable attorneys' fees, court costs, storage costs, rental charges, transportation charges and similar expenses paid or incurred in enforcing any of Payee's rights hereunder or in connection with any of the collateral securing this Note, promptly on demand of Payee or other person incurring the same.

10.    Governing Law; Interpretation.  This Note shall be interpreted and the rights and liabilities of the parties shall be determined in accordance with the internal laws of the State of Illinois, excluding any choice or conflict of law rules. Whenever possible each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note. If this Note contains any blanks when executed by Adams and Walford, Payee is hereby authorized, without notice to Maker, to complete any such blanks according to the terms upon which the loan is granted. Whenever in this Note reference is made to Payee, such reference shall be deemed to include, as applicable, a reference to Payee's successors and assigns  The provisions of this Note shall inure to the benefit of Payee and its successors and assigns and shall be binding upon Adams and Walford and their successors and assigns; provided, however, that Adams and Walford may not delegate their obligations under this Note without Payee's prior written consent.

11.    Purpose and Change to Unpaid Amount.  This Note is given to acknowledge the liability of Adams and Walford to Payee for the debit amount in the individual and joint accounts previously maintained by Adams and Walford with Payee. The principal amount shall be subject to adjustment as provided in Section 1 of the Forbearance Agreement. In addition, if, but only if, Adams and Walford have complied with all of their obligations under the Forbearance Agreement, as of the Maturity Date, the unpaid balance on this Note shall be reduced to zero ($-0-) and Adams and Walford shall have no further liability on this Note, or at their option they may require that this Note be assigned to them or to their designee. For the purpose of this Section 11, Payee shall give Adams and Walford notice in writing of any failure of compliance with the terms of the Forbearance Agreement within ninety days of its actual knowledge of any non-compliance, and Adams and Walford shall have thirty days to cure such noncompliance. Any noncompliance for which timely notice is not given and any noncompliance that is timely cured shall not be a basis to deny reduction of the balance on the Maturity Date.

12.    Security  This Note is secured by an Assignment of even date of Income Tax Refunds by Adams, as assignor, to Payee, as assignee. This Note is also secured by an Assignment of even date of Income Tax Refunds by Walford, as assignor, to Payee, as assignee. This Note shall also be secured by a collateral assignment of, and granted a security interest in, the joint New Trading Account to be established as set forth in the Forbearance Agreement.

13.    Limitation of Personal Liability.  The personal liability of Adams and Walford shall each be limited to an amount that does not exceed one half of the total liability of principal and interest hereunder, provided that for purposes of determining such liability all proceeds of tax refunds and Net Trading Gains applied as provided in the Forbearance Agreement shall be deemed to have been paid out half by each.

14.    Waivers; Jurisdiction.  TO INDUCE PAYEE TO ACCEPT THIS NOTE, MAKER HEREBY CONSENTS, SUBJECT TO PAYEE'S SOLE AND ABSOLUTE ELECTION, TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITUATED IN COOK COUNTY, ILLINOIS. ADAMS AND WALFORD WAIVE TRIAL BY JURY AND WAIVE ANY OBJECTION BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS, WITH REGARD TO ANY ACTIONS, CLAIMS, DISPUTES OR PROCEEDINGS RELATING TO THIS AGREEMENT, OR ANY DOCUMENT DELIVERED HEREUNDER OR

-2-

IN CONNECTION HEREWITH, OR ANY TRANSACTION ARISING FROM OR CONNECTED TO ANY OF THE FOREGOING.

SCOTT A. ADAMS

ROBERT W. WALFORD

# Exhibit C

Execution Version

## ASSIGNMENT OF INCOME TAX REFUNDS

This Assignment of Income Tax Refunds (the "Assignment") is made March 11, 2009, by Robert W. Walford, an individual residing in Suffolk County New York ("Assignor"), to FCStone, LLC, an Iowa limited liability company having offices at 141 West Jackson Blvd., Suite 3650, Chicago, IL 60604 ("Assignee").

Assignor assigns to Assignee all of Assignor's interest in the refunds Assignor may be entitled to receive from the Internal Revenue Service in accordance with Assignor's United States Individual Income Tax Returns for the years 2008, 2009 and all previous years. This assignment is made pursuant to the Forbearance Agreement of this date between Assignor and Assignee ("Forbearance Agreement") and is subject to its terms, including but not limited to the provision contained in Section 2 (e).

Assignor also assigns to Assignee all of Assignor's interest in the refunds Assignor may be entitled to receive from the New York Department of Taxation and Finance or other tax authority in accordance with Assignor's state and city income tax returns for the years 2008, 2009, and all previous years.

The above-referenced refunds shall hereinafter be referred to as the "Refunds" (or, individually, as a "Refund").

Assignor shall be responsible for pursuing his Refunds claims against the relevant governmental taxing agencies, and Assignor shall take all steps necessary to properly and timely file said claims.

Assignor understands that if any of the above-mentioned Refunds or Refund amounts are offset by a taxing authority for amounts, liabilities, past-due support, or other obligation Assignor owes, or if the Refund or Refund amounts are reduced for any other reason:

(1) Assignor shall not be relieved from performing to the fullest extent possible under this Assignment, and Assignor shall assign to Assignee all interest in the remaining Refund amounts to which Assignor is entitled after such offset or reduction, and

(2) Any offset or reduction and partial performance of this Assignment shall not relieve Assignor of his remaining obligation to pay Assignee the amounts still owed to Assignee under this Assignment (i.e., the difference between the above-stated anticipated Refunds and the actual amount Assignee receives).

Assignor shall execute and deliver all additional documents that may be required to accomplish the assignment of the Refunds to Assignee. Assignor shall deliver to Assignee each Refund Assignor receives within 5 business days of receiving each Refund. Assignor reserves the claw back rights set forth in Section 2(h) of the Forbearance Agreement.

ROBERT W WALFORD

Execution Version

## ASSIGNMENT OF INCOME TAX REFUNDS

This Assignment of Income Tax Refunds (the "Assignment") is made March 11, 2009, by Scott A. Adams, an individual residing in New York, New York ("Assignor"), to FCStone, LLC, an Iowa limited liability company having offices at 141 West Jackson Blvd., Suite 2650, Chicago, IL 60604 ("Assignee").

Assignor assigns to Assignee all of Assignor's interest in the refunds Assignor may be entitled to receive from the Internal Revenue Service in accordance with Assignor's United States Individual Income Tax Returns for the year 2008, 2009 and all previous years. This assignment is made pursuant to the Forbearance Agreement of this date between Assignor and Assignee ("Forbearance Agreement") and is subject to its terms.

Assignor also assigns to Assignee all of Assignor's interest in the refunds Assignor may be entitled to receive from the New York Department of Taxation and Finance or other tax authority in accordance with Assignor's state and city income tax returns for the years 2008, 2009, and all previous years.

The above-referenced refunds shall hereinafter be referred to as the "Refunds" (or, individually, as a "Refund").

Assignor shall be responsible for pursuing his Refunds claims against the relevant governmental taxing agencies, and Assignor shall take all steps necessary to properly and timely file said claims.

Assignor understands that if any of the above-mentioned Refunds or Refund amounts are offset by a taxing authority for amounts, liabilities, past-due support, or other obligation Assignor owes, or if the Refund or Refund amounts are reduced for any other reason:

    (1)  Assignor shall not be relieved from performing to the fullest extent possible under this Assignment, and Assignor shall assign to Assignee all interest in the remaining Refund amounts to which Assignor is entitled after such offset or reduction, and

    (2)  Any offset or reduction and partial performance of this Assignment shall not relieve Assignor of his remaining obligation to pay Assignee the amounts still owed to Assignee under this Assignment (i.e., the difference between the above-stated anticipated Refunds and the actual amount Assignee receives).

Assignor shall execute and deliver all additional documents that may be required to accomplish the assignment of the Refunds to Assignee. Assignor shall deliver to Assignee each Refund Assignor receives within 5 business days of receiving each Refund. Assignor reserves the claw back rights set forth in Section 2(h) of the Forbearance Agreement.

SCOTT A. ADAMS

# EXHIBIT D

CXLD 4-17-07 / DUP STATEMENTS FOR R. WALDON/ELD ✓ / REPORTS ✓ 2SAR / EMAIL + MAILED STATEMENTS

*[Handwritten top right:]* 95250/53 - 95255 / 95256 / 95257 / 95258

# FCStone™

## JOINT CUSTOMER ACCOUNT AGREEMENT
### (IF ACCOUNT IS TO BE HELD AS TENANTS-IN-COMMON, PAGE 1(b) MUST ALSO BE COMPLETED)

Sales Code ___7AR___  Account Number __95250 253 255,256,___

*[Handwritten:]* 257 & 258  & R9585

### ALL QUESTIONS ON THIS SECTION OF THE ACCOUNT FORM SHOULD BE ANSWERED

Customer 1
Name __Scott Adams__                           Social Security Number _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_

Residence Address __310 West 105th Street__

City __New York__          State __NY__          Zip __10025__  Age __38__

Employer __Self__                    Occupation __Commodities trader__

Business Address __1 North End Avenue, Suite 1221__

City __New York__          State __NY__          Zip __10282__

Home Phone __917-757-6442__    Business Phone __212-346-3735__

E Mail Address __adamsnyc@gmail.com__

Bank Reference __Clemveel/Choie__          Bank Account Number __044433367__

Bank Address __160 Canel St. New York, NY__

Address to which my account statements should be sent (if different from home address)

Address _____

City _____ State _____ Zip _____

Annual Income: ☐ Less than $25,000 ☐ $25,000 to $50,000 ☐ $50,000 to $100,000 ☑ Over $100,000

Net Worth: (exclusive of residence and personal belongings) ☐ Less than $25,000 ☐ $25,000 to $50,000
☑ Over $50,000

Years of Experience in the following areas: __17__ Futures __17__ Futures Options __13__ Stocks
__13__ Stock Options __13__ Bonds _____ Other

Will this account be traded on your behalf by anyone other than you? ☑ NO ☐ YES (If YES, please complete and attach a Managed Account Authorization form.)
Does any other person/entity control the trading of this account?        YES ☐ NO ☑
Have a financial interest in this account?                                              YES ☐ NO ☑
Guarantee this account?                                                                        YES ☐ NO ☑

If you have answered YES to any of the above, please give name(s) of person(s): _____

Is there currently pending or has there ever been any litigation, disputed accounts or other matters between commodity or securities brokers, exchanges, or federal or state regulatory bodies and you? NO ☐ YES ☑ (IF YES, please describe): _____

Are you related to an employee of FCStone? YES ☐ NO ☑ If yes, name of employee is _____

Revised 01/2002

Page 1(a) of 8

*2 SAL-95250, 95253*
*+ 95255 thru*
*95258*

*Customer 2*

Name  Robert Welford                     Social Security Number  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

Residence Address  3 Van Wyck Lane

City  Lloyd Harbor        State  NY        Zip  11743  Age  39

Employer  Self              Occupation  Commodities Trader

Business Address  One North End Ave  Suite 1221

City  New York        State  NY        Zip  10282

Home Phone _____ Business Phone  212-346-7735

E Mail Address  robwel 2006 @ yahoo. com

Bank Reference _____ Bank Account Number _____

Bank Address _____

*Address to which my account statements should be sent (if different from home address)*

Address _____

City _____ State _____ Zip _____

Annual Income: ☐ Less than $25,000  ☐ $25,000 to $50,000  ☐ $50,000 to $100,000  ☑ Over $100,000

Net Worth: (exclusive of residence and personal belongings) ☐ Less than $25,000  ☐ $25,000 to $50,000  ☑ Over $50,000

Years of Experience in the following areas: __19__ Futures __19__ Futures Options __19__ Stocks __19__ Stock Options __19__ Bonds __19__ Other

Will this account be traded on your behalf by anyone other than you? ☑ NO  ☐ YES (If YES, please complete and attach a Managed Account Authorization form.)

Does any other person/entity control the trading of this account?  YES ☐ NO ☑
Have a financial interest in this account?  YES ☐ NO ☑
Guarantee this account?  YES ☐ NO ☑

If you have answered YES to any of the above, please give name(s) of person(s): _____

Is there currently pending or has there ever been any litigation, disputed accounts or other matters between commodity or securities brokers, exchanges, or federal or state regulatory bodies and you?
NO ☑ YES ☐ (IF YES, please describe): _____

_____
_____

Are you related to an employee of FCStone? YES ☐ NO ☑ If yes, name of employee is _____

Revised 01/2002

Page 1(a) of 8

## DESIGNATION OF JOINT ACCOUNT

If this is a joint account, each of us is authorized to transmit to and receive communications from FCStone, LLC ("FCStone") in all respects as if each of us alone were the owner of the account and our liability shall in all respects be joint and several. FCStone may, upon the request of any of us, remit, disburse or transfer any property to any one of us without obligation to inquire and without liability relating to or arising out of any such transfer, disbursement or remittance. The survivor shall immediately give FCStone notice in the event of the death of any of us, but such event shall not extinguish the liability of the deceased's estate to FCStone.

FCStone is to presume that we have consulted with legal counsel concerning the manner in which this account should be held, and UNLESS WE HAVE STRICKEN THIS PARAGRAPH AND COMPLETED THE FOLLOWING PARAGRAPH, it is our intention to create an account as joint tenants with rights of survivorship, not as tenants-in-common, and that in the event of the death of either of us, the interest in the property in the joint account shall automatically be vested in the survivor(s).

Having stricken the immediately preceding paragraph, it is the intention of the undersigned to create an account as tenants-in-common, without rights of survivorship and not as joint tenants. Therefore, in the event of the death of any of the undersigned, the interests in the account shall be, as of the close of business on the date of death in the following respective percentages:

| 50% | Scott Adams | [signature] |
|-----|-------------|-------------|
| Percentage of Ownership | Print or Type Name of Customer | Customer Signature |

| 50% | Robert Wolford | [signature] |
|-----|----------------|-------------|
| Percentage of Ownership | Print or Type Name of Customer | Customer Signature |

| | | |
|-----|-----|-----|
| Percentage of Ownership | Print or Type Name of Customer | Customer Signature |

(Only the names and percentages of the present owners of the account should be listed. DO NOT designate heirs or beneficiaries.)

**READ THIS ENTIRE AGREEMENT BEFORE SIGNING.** A signed copy must be returned to FCStone, LLC and one copy should be kept by the customer. This Agreement is for a Non-Discretionary account unless additional documents are signed, submitted and approved by FCStone, LLC, a Futures Commission Merchant ("FCM"). This is an agreement for FCStone, LLC to act as FCM for the Undersigned in the purchase and sale of commodities futures contracts, commodity option contracts, cash commodities forward contracts, spot and foreign exchange transactions, EFP's, foreign currency-denominated financial instruments, and all other transactions related thereto (hereinafter "Commodity Interests"). This agreement shall be continuous and shall cover, individually and collectively, all accounts of Customer at any time opened and/or accounts from time to time closed and then reopened with FCM, irrespective of any change or changes at any time in the personnel of FCM or its successors, assigns, or affiliates, for any cause whatsoever; shall inure to the benefit of FCM and its successors and assigns, whether by merger, consolidation or otherwise; and shall be binding upon Customer and the estate, executors, administrators, legal representatives, successors and assigns of Customer. Customer hereby ratifies all transactions with FCM effected prior to the date of this agreement, and agrees that the rights and obligations of Customer in respect thereto shall be governed by the terms of this agreement, which supersedes all other customer agreements between FCM and Customer. The Undersigned agrees as follows:

**1. Agency.** Customer authorized FCM to purchase and sell Commodity Interests for Customer's account in accordance with Customers' oral or written instructions, or from a third party in the case of a "managed" or "discretionary" accounts, as given to FCM by Customer's Introducing Broker ("IB") or Associated Person ("AP"). Customer authorizes FCM, for the accounts of Customer to make such advances and expend such monies and, whenever possible to borrow and deliver such monies or securities or properties as may be required with respect to such transactions. FCM shall be under no duty or obligation to inquire into the purpose or propriety of any instruction given by any Customer in the case of a joint account and shall be under no obligation to oversee the application of any funds delivered to any Customer or third party in accordance with customers' instructions. All orders to buy or sell Commodity Interests must be complete and contain the following information: (a) Whether such order is a buy or sell order; (b) Customer's identity and account number; (c) Commodity Interest; (d) Quantity; (e) Price, if applicable; (f) Contract delivery month; (g) Any special instructions.

**2. FCM LIABILITY FOR INTRODUCED ACCOUNTS.** FCM'S SOLE RESPONSIBILITY PURSUANT TO THIS AGREEMENT, IS LIMITED TO THE EXECUTION, CLEARING AND BOOKKEEPING OF TRANSACTIONS FOR THE CUSTOMER'S ACCOUNTS ON THE VARIOUS EXCHANGES IN ACCORDANCE WITH INSTRUCTIONS RECEIVED BY FCM FROM THE INDEPENDENT INTRODUCING BROKERS "IIB(S)" IN ACCORDANCE WITH USUAL PRACTICE. THE CUSTOMER SHALL LOOK ONLY TO SAID IIB FOR ANY REDRESS WITH RESPECT TO ANY MATTER OTHER THAN FCM'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT IN EXECUTING, CLEARING AND/OR BOOKKEEPING OF TRANSACTIONS FOR THE ACCOUNTS OF THE UNDERSIGNED. CUSTOMER ACKNOWLEDGES THE SEPARATION OF FCM AND IIB AND AGREES THAT FCM SHALL NOT BE RESPONSIBLE OR LIABLE WHATSOEVER FOR ANY MATTERS RELATING TO SALES PRACTICE, TRADING PRACTICE OR RECOMMENDATION OR ANY SIMILAR OR OTHER MATTERS WHETHER AUTHORIZED OR UNAUTHORIZED BY THE CUSTOMER. CUSTOMER FURTHER ACKNOWLEDGES THAT THE IIB INTRODUCING THE ACCOUNT TO FCM IS RESPONSIBLE FOR COLLECTING FUNDS ON CUSTOMER'S BEHALF AND DIRECTING THE WITHDRAWAL OF FUNDS FROM CUSTOMER'S ACCOUNT IN EXCESS OF THAT REQUIRED TO MAINTAIN APPLICABLE MARGIN REQUIREMENTS. FCM IS NOT RESPONSIBLE FOR FUNDS UNTIL IT RECEIVES THEM FROM THE CUSTOMER OR IIB.

**3. Margins.** Customer shall deposit with FCM sufficient funds to meet the applicable initial and maintenance margin requirements. FCM may reject any order if Customer does not have sufficient margin on deposit and may delay the processing of any order while determining the correct margin status of Customer's account. Customer shall, without notice or demand maintain adequate margins at all times so as to continuously meet the margin requirements established by FCM. FCM may establish margin requirements and from time to time, change such margin requirements in its sole and absolute discretion and said requirements may exceed the margin requirements set by any commodity exchange or other regulatory authority. Customer agrees, when requested by FCM, to immediately wire transfer funds to adequately maintain margins and to furnish FCM with the names of bank officers for immediate confirmation of such transfers. Choosing not to demand wire transfer of funds or the acceptance of funds by mail shall not constitute a waiver of the right of FCM to demand wire transfer of funds at any time. If at any time Customer's account does not contain the amount of margin required, FCM may, in its sole and absolute discretion, without notice or demand to Customer, close out Customer's open position(s) in whole or in part or take any other action it deems necessary to satisfy such margin requirements. Failure of FCM to close out open position(s) in whole or in part in such circumstances shall not constitute a waiver of its rights to do so at any time thereafter, nor shall FCM be subject to any liability to Customer for its acts or its failure to so act. FCM shall not be liable to Customer for the loss of any margin deposits which is the direct or indirect result of the bankruptcy insolvency, liquidation, receivership, custodianship, or assignment for the benefit of any bank, other clearing broker, exchange, clearing organization, or similar entity. Notwithstanding the above, FCM may, in its discretion, refuse to accept an order from the Customer.

**4. Treatment of Funds.** Customer opens at least two accounts (2) on the books of the FCM. One designated Regulated where all transactions designated as regulated by the Commodity Futures Trading Commission ("CFTC") will be carried, and the other designated Nonregulated where deliveries and/or transactions on foreign exchanges, if any, will be carried. FCM is hereby authorized to transfer funds as it deems necessary between these accounts. Further, if the Customer has more than one Regulated and/or Nonregulated account or has a joint account, from time to time, FCM, in its sole discretion and without prior notice to Customer, may apply or transfer (including segregated funds or other property) interchangeably between any of the Customer accounts at FCM or an affiliate of FCM as may be necessary for margin or to satisfy or reduce any deficit or debit balance in any Customer account.

Revised 08/2002

Customer's Initials: _EA_ _RW_

5. **Indemnification.** Customer agrees to indemnify FCM and hold FCM harmless from and against any and all liabilities, losses, damages, costs and expenses, including accountants' and attorneys' fees, incurred directly or indirectly, by FCM because the Customer's representations and warranties shall not be true and correct in any material respect or the agreements made herein by Customer shall not be fully and timely performed, from any action or omission by Customer with respect to the account(s), including but not limited to, any debit and deficit balances which may occur in Customer's account, interest on any debit and deficit balances calculated from the date hereof at a fluctuating rate per annum equal to the sum of one percent plus the rate of interest then most recently published in *The Wall Street Journal* as the prime rate, taxes that FCM may be required to pay on any commodity interest or other property held in the accounts of the Customer or fine or penalty that FCM may be required to pay because Customer caused FCM to violate any statute, regulation or rule of any exchange or regulatory body. Customer also agrees to pay promptly to FCM all damages, costs and expenses, including attorneys' fees, incurred by FCM in the endorsement of any of the provisions of this agreement.

6. **Acknowledgment Risks.** Customer acknowledges that Commodity Interests trading is a highly speculative activity involving highly leveraged and rapidly fluctuating markets and may result in significant losses, which losses may substantially exceed Customer's margin deposits. Despite such risks, Customer is willing and able to assume the financial risks and other hazards of Commodity Interests trading and agrees that Customer will in no manner hold FCM responsible for losses incurred through following IB's or FCM's trading recommendations or suggestions and expressly hereby waives any claims therefore. FCM is not responsible for delays in transmission, delivery or execution of Customer's orders due to malfunctions of communication facilities or other causes. Customer has read and understands the Risk Disclosure Statement.

7. **Commission Fees.** Customer agrees to pay to FCM commission charges in effect from time to time and any other costs to FCM occasioned by carrying the account of Customer. Customer agrees that FCM may debit Customer's account for customary brokerage and commission charges and for charges for any other services rendered by FCM, including all payments made on behalf of Customer, which charges may vary from time to time, without notice to Customer. Customer agrees to pay any additional fees or commissions charged for taking and/or making deliveries, interest, fees levied by the Regulatory authorities and commissions and fees charged for the transfer of the Customer's account to another FCM.

8. **Interest.** In accordance with Commodity Futures Trading Commission Regulation 1.29, the FCM may receive and retain as its own any increment or interest resulting from the proper investment of the funds held in the Customers account.

9. **Security Interest.** Customer grants FCM a security interest in all monies, securities, negotiable instruments, open positions in Commodity Interests and all receipts of other documents representing underlying commodities, including without limitation warehouse receipts, and all commodities represented by such receipts or other documents or other property now or at any future time held in Customer's account or which may be in FCM's possession for any purpose, including safekeeping, to secure payment of all obligations of Customer to FCM irrespective of the number of accounts Customer may have with FCM. All funds, securities, commodities, futures contracts, and other Property of the Customer which FCM may, at any time, be carrying for Customer (either individually, jointly with others or as a guarantor of the account of another person) or which at any time may be in FCM's possession or control or carried on its books for any purpose including safekeeping, are to be held by FCM as security and subject to the general lien and right of set-off for all liabilities of Customer to FCM or any affiliate of FCM. FCM may at any time, in its sole and absolute discretion, liquidate any of the above-mentioned items in order to satisfy any margin or account deficiencies including but not limited to debit or deficit balances resulting from transactions executed by the FCM for the Customer, interest charges, service charges, expenses incurred by FCM, including court costs and attorney's fees incurred in collecting debit or deficit balances of Customer in any account and may transfer said property or assets to the general ledger account of FCM or pledge, transfer, or lend such items, all without liability on the part of FCM to Customer or any third party. Furthermore, FCM, is also granted a security interest on all proceeds which now or at any time may come into the Customer's account, and the Customer agrees to execute any and all documents including Uniform Commercial Code financing statements, deemed necessary or advisable by FCM to evidence or perfect such security interest. FCM shall also have full authority to set off, in addition to other rights set forth in this Agreement, all debts owing to the FCM by the Customer against any and all claims which the Customer may have against the FCM. Customer agrees that all demands for debits owing FCM shall be met within twenty-four (24) hours following either of (i) Customer's receipt of FCM's oral request for payment or (ii) FCM's delivery to Customer of FCM's written request for payment (except as payment modified with respect to wire and telephone requests for margin funds as herein set forth).

10. **Failure to Deliver.** Customer agrees to deliver to FCM, at least two business days prior to the delivery date, any security, commodity or property or documents representing ownership of same (including but not limited to warehouse receipts), previously sold by FCM on Customer's behalf, which FCM in its sole and absolute discretion deems necessary to effect a good delivery pursuant to the rules and delivery procedures of the contract market on which the delivery is contemplated. If at any time Customer shall be unable to deliver to FCM any security, commodity or other property previously sold by FCM on Customer's behalf, Customer authorizes FCM, in FCM's sole discretion, to borrow or buy and deliver the same, and Customer shall immediately pay and indemnify FCM for any costs, interest, losses and damages (including consequential costs, losses and damages) which FCM may sustain from its inability to borrow or buy any such security, commodity or other property. In the event FCM takes delivery of any security, other property or commodity for Customer's account, Customer agrees to indemnify and hold FCM harmless from and against any loss it may suffer resulting, directly or indirectly, from any decline in value of said security, commodity or other property.

Revised 08/2002

Customer's Initials

**11. Market Information.** Customer acknowledges that (a) any market recommendations or information communicated to Customer do not constitute an offer to sell or the solicitation of an offer to buy any Commodity Interest; (b) such recommendations and information, although based upon information obtained from sources believed to be reliable, may be incomplete and unverified; and (c) FCM and the IB make no representation, warranty, or guarantee as to, and shall not be responsible for the accuracy or completeness of, any information or trading recommendation furnished to Customer. Customer understands that FCM, its affiliates or representatives, and/or the IB may have a position in and may intend to buy or sell Commodity Interests which are the subject of market recommendations furnished to Customer, and that the market position of FCM or any such affiliate or representative and/or the IB may or may not be consistent with the recommendations furnished to Customer by FCM and/or the IB.

**12. Government and Exchange Rules.** All transactions under this Agreement shall be subject to the applicable constitution, rules, regulations, customs, usages, rulings and interpretations of the exchanges, clearing house or markets on which such transactions are executed by FCM for Customer's account, the National Futures Associates ("NFA") and, where applicable, to the provisions of the Commodity Exchange Act, as amended, and the rules and regulations promulgated thereunder and to any other applicable government statutes, rules and regulations. FCM shall not be liable to Customer as a result of any action taken by FCM or its agents in compliance with any of the foregoing rules or laws. This paragraph is solely for the protection and benefit of FCM, and any failure by FCM or its agents to comply with any of the foregoing rules or laws does not relieve Customer of any obligations under this agreement nor be construed to create rights under this agreement in favor of Customer against FCM. If any statute, rule, or regulation shall hereafter be adopted by any governmental authority, exchange, board of trade, clearing house, or self regulatory organization, including but not limited to the NFA which shall be binding upon FCM or any exchange clearing member firm selected by FCM and shall affect in any manner or be inconsistent with any of the provisions hereof, the affected provisions of this agreement shall be deemed modified or superseded, as the case may be, by the applicable provisions of such statute, rule, or regulation, and all other provisions of this agreement and provisions so modified shall in all respects continue in full force and effect.

**13. Clearing.** Unless otherwise specified, FCM is authorized to execute such orders upon any exchange or other place which may be deemed by FCM, in its sole discretion, to be most desirable, including another exchange clearing member firm and/or floor broker selected by FCM, in its sole discretion, either on an omnibus clearing arrangement or on a fully disclosed clearing arrangement. All rights and obligations extended to FCM pursuant to this agreement, and all other provision of this agreement shall also become those of such exchange clearing member firm.

**14. Liquidation of Accounts.** In the event (a) of Customer's death or, in the case of a joint account, the death of the last survivor thereof; (b) of a decision to dissolve and/or liquidate by a corporate Customer, which decision shall be immediately communicated to FCM; (c) of the filing of a petition of Bankruptcy by or against Customer; (d) of the institution of any similar state, federal or other insolvency proceedings by or against Customer; (e) of the appointment of a receiver for Customer or for any of the assets of Customer; (f) an attachment is levied against Customer's account (or any of them); (g) a notice of levy with respect to Customer's account (or any of them) is served on FCM by any competent taxing authority; (h) Customer fails to timely meet any margin calls; or (i) FCM, for any reason whatsoever, deems itself insecure or if necessary for FCM's protection, then FCM is hereby authorized, in its sole discretion, to sell any or all of the Commodity Interest or other property of Customer which may be in FCM's possession, or which FCM may be carrying for Customer, or to buy in any Commodity Interests or other property of which the account or accounts of Customer may be short, or cancel any outstanding orders, in order to close out the account or account of Customer in whole or in part or in order to close out any commitment made on behalf of Customer, all without any liability on the part of FCM to Customer, or any third party. Such sale, purchase or cancellation may be made according to FCM's judgment and may be made at its sole discretion, on the exchange or other market where such business is usually transacted, including an Exchange for Physicals (EFP) transaction, without notice to Customer or the legal representatives of Customer, and FCM may purchase the whole or any part thereof free from any right of redemption, and Customer shall remain liable for any deficiency, it being understood that a prior tender, demand or call of any kind, from FCM, or prior notice from FCM, of the time or place of such sale or purchase shall not be considered a waiver of Brokers rights to sell or buy any Commodity Interests or other property held by FCM or owned by Customer, at any time as hereinbefore provided or to be deemed to require any such tender, demand, call or notice on any subsequent transaction. Further, FCM may, at its option, cause a whole or partial liquidation of Customer's account or the straddling of existing open positions in the event they cannot be satisfactorily liquidated because the market is up or down the limit. Any of the above actions may be taken without demand for margin or additional margin, without prior notice of sale or purchase or other notice or advertisement to Customer, his personal representatives, heirs, executors, administrators, legatees, or assigns, and regardless of whether the ownership interest shall be solely Customer's account or held jointly with others.

**15. Assignment** The FCM may assign the Customer's account or accounts to another registered FCM by notifying the Customer of the date and name of the intended assignee FCM ten (10) days prior to the assignment, Unless the Customer objects to the assignment in writing prior to the scheduled date for the assignment, the assignment will be binding on the Customer.

**16. Events Beyond Control of FCM.** FCM shall not be responsible for any loss or damage caused directly or indirectly, by any events, actions or omissions beyond the control of FCM, including without limitation, loss or damage resulting, directly or indirectly, from any delays or inaccuracies in the transmission of orders or other information due to a breakdown in or failure of any transmission or communication facilities.

Revised 08/2002

Customer's Initials _SA_ _RW_

.17. Notice and Reports. All communications, reports, statements, monies, securities, negotiable instruments, and other property, whether by mail, telex, courier, telephone, telegraph, messenger, facsimile, or otherwise (in the case of mailed notices), or communicated (in the case of telephone notices), sent to Customer at Customer's address (or telephone number) as given to FCM from time to time shall constitute personal delivery to Customer whether or not actually received by Customer, and Customer hereby waives all claims resulting from failure to receive such communications. Customer shall make all payments, except with regard to wire transfers discussed above, and deliver all notices and communications to FCM'S EXECUTIVE OFFICE LOCATED AT SUITE 200, 2829 WESTOWN PARKWAY, WEST DES MOINES, IOWA, 50266-1333, ATTN: COMPLIANCE DEPT. Customer agrees to immediately open, read and act on all communications sent to Customer by FCM. Confirmations of trades, statements of account, margin calls, and any other written notices shall be binding on Customer for all purposes. Reports of Customer calls any error therein to FCM's attention in writing (a) prior to the start of business on the next business day following notification, in the case of margin calls and reports of executions and (b) within 5 days of delivery to Customer, in the case of statements of account and any written notices (other than trade confirmations or margin calls) or demands. FAILURE TO SO NOTIFY FCM SHALL BE DEEMED RATIFICATION OF ALL ACTIONS TAKEN BY FCM OR FCM'S AGENT PRIOR TO SAID INFORMATION BEING FURNISHED TO CUSTOMER. Customer agrees that in the event of a discrepancy in the status of Customer's account, Customer will take reasonable measures to rectify such discrepancies, including but not limited to buying or selling contracts, as appropriate at the best available price within a reasonable time from the discovery of such discrepancy. In the event that a discrepancy is due solely to FCM's error, FCM agrees to credit Customer's account for the discrepancy; provided, however, that Customer has taken reasonable measures to correct such discrepancy as set forth above. FCM shall not be responsible for any amount unrealized or any loss to Customer's account due to Customer's failure to take reasonable measures to correct any account discrepancy. Customer further agrees to contact FCM by telephone to verify the account status within two (2) business days after placing any order if Customer has not been advised by telephone of the status of such order by FCM within twenty-four (24) hours after said order(s) was/were placed. CUSTOMER AGREES THAT FAILURE TO CONTACT FCM AS PROVIDED ABOVE SHALL RELIEVE FCM OF ANY RESPONSIBILITY ARISING FROM THE LACK OF EXECUTION OF SUCH ORDER(S). CUSTOMER FURTHER ACKNOWLEDGES THAT ALL ORDERS SHALL BE GOOD FOR THE DAY SUCH ORDERS ARE PLACED ONLY, UNLESS SPECIFIED BY THE CUSTOMER TO BE OPEN ORDERS. None of these provisions, however, will prevent FCM, upon discovery of any error or omission, from correcting it. The parties agree that such errors, whether resulting in profit or loss, will be corrected in Customer's account, will be credited or debited so that it is in the same position it would have been in if the error had not occurred. Whenever a correction is made, FCM will promptly make written notification to Customer.

18. Modification. This Agreement may be altered, modified or amended by FCM from time to time by written notice to Customer unless Customer shall object within three (3) business days of receipt thereof to such modification, alteration or amendment. No other modification, amendment or addition to this Agreement shall be effective unless reduced to writing and signed by both Customer and an Executive Officer of the FCM. This instrument embodies the entire Agreement of the parties, superseding any and all prior agreements and there are no terms, conditions or obligations other than those contained herein. Customer represents that Customer has not altered, modified or changed this Agreement.

19. Trading Representations. The Customer understands that on certain trading days, trading in certain commodities, commodity options, leverage contracts and underlying commodities or futures contracts may cease or expire and that, with respect to commodity options and underlying commodities or futures contracts traded outside the United States, trading days and hours may not coincide with domestic trading days or hours and that these may result in financial disadvantage to Customer. The Customer hereby agrees to hold FCM, FCM's officers, partners, and agents including the IB harmless against such loss.

20. Further Representations. The Customer represents, warrants and agrees that: (a) All of the information contained on the Customer Fact Sheet is true, correct and complete as of the date hereof and since FCM is relying thereon undersigned will promptly notify the FCM of any changes herein; (b) The trading in Commodity Interests is within the power of the Customer and such activity will in no matter contravene the provisions of any statutes, rules or regulations, judgments, orders or decrees or agreements to which the Customer is bound or subject; (c) If Customer is a corporation, it is duly organized and in good standing under the laws of the state of its incorporation and every state in which it does business; (d) The actions of the authorized person designated on the Customer Fact Sheet to act for the Customer has been authorized by all necessary or appropriate corporate action if applicable, such person has full authority to execute this Customer Agreement and all related documents on behalf of the Customer and to act for Customer in all matters regarding Customer's account(s) and FCM may at all times rely on the fact of such authority without any duty to investigate into either the authenticity or extent thereof; (e) If applicable, Customer will confirm the matters contained in paragraph 22(d) by supplying FCM, within a reasonable time, prior to the commencement of trading, with an executed copy of resolutions of the Board of Directors of Customer in a form prescribed by FCM; (f) If Customer is a partnership, the partnership has express authority to speculate in Commodity Interests; and (g) Customer has never been suspended or barred from trading by the Commodity Futures Trading Commission or any predecessor agency or any other federal or state regulatory agency or any exchange or trade association, and Customer undertakes to notify FCM of any change in such status within two (2) business days of any such change. Customer further represents that he is of legal age and sound mind and that, except as disclosed in writing to FCM, no one except Customer has any interest in any account or accounts carried for Customer by FCM. CUSTOMER FURTHER REPRESENTS THAT HE IS NOT AN EMPLOYEE OF ANY EXCHANGE, ANY CORPORATION IN WHICH ANY EXCHANGE OWNS A MAJORITY OF THE CAPITAL STOCK, ANY MEMBER OF AN EXCHANGE, ANY FIRM REGISTERED ON ANY EXCHANGE, ANY FUTURES COMMISSION MERCHANT, AND INTRODUCING BROKER, OR ANY BANK, TRUST, OR INSURANCE COMPANY. IN THE EVENT THAT CUSTOMER BECOMES SO EMPLOYED, HE WILL PROMPTLY NOTIFY FCM IN WRITING OF SUCH EMPLOYMENT.

21. Verification. Customer authorizes FCM to contact such banks, financial institutions and credit agencies as FCM shall deem appropriate from time to time to verify the information regarding Customer which may be provided by Customer from time to time. Customer understands that an

Revised 08/2002

Customer's Initials ⟩A  RV

investigation may be made pertaining to his personal and business credit standing and that Customer may make written request within a reasonable period of time for disclosure of such investigation's nature and scope.

**22. Conversion Rate Risk.** In the event that FCM is directed to enter into any Commodity Interest contract in any exchange or board of trade involving transactions effected in a foreign currency: (a) any profit or loss arising as a result of a fluctuation in the rate of exchange affecting such currency will be entirely for the Customer's account and risk; (b) be made in U.S. Dollars in such amounts as FCM may, in its sole discretion require, and (c) FCM has the sole discretion to convert funds in Customer's account into and from such foreign currency at a rate of exchange determined by FCM as it deems necessary and proper and on the basis of then prevailing money markets.

**23. Telephone Recording.** Customer acknowledges, authorizes and consents to the recording of Customer's telephone conversations with PCM or any of its agents or associated persons by means of electronic recording devices with or without the use of an automatic tone warning device. Customer understands, authorizes and consents to the use of such recordings, and/or transcripts thereof, as evidence by either party in any action arising out of this Agreement. FCM may, but shall not be required, in its normal course of business, to erase such recordings following their production.

**24. Construction and Controversies.** Customer hereby expressly acknowledges that this Agreement is made in the State of Illinois (upon acceptance by FCM), and further, that by virtue of trading commodity futures or options in the account established hereby, Customer is transacting business in the State of Illinois; accordingly, Customer hereby submits and consents to jurisdiction of his person in the Courts of the State of Illinois and, shall be amenable to service of summons and other legal process of, and emanating from, the State of Illinois. This Agreement's validity, construction and enforcement shall be governed by the laws of the State of Illinois. Customer hereby submits to the exclusive jurisdiction of such courts, and expressly waives the right to the adjudication or enforcement of such controversies by any court or any other tribunal sitting in any other jurisdiction, and further expressly waives the provisions of any statute or administrative ruling defining a commodity or commodity contract to be a security. Wherever possible, each portion of this Agreement shall be interpreted in a manner to be valid and effective under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provisions or the remaining provisions of this Agreement. This Agreement shall inure to the benefit of your present organization, and any successor organization, irrespective of any change or changes at any time in the personnel thereof for any cause whatsoever, and the assigns of your present organization. This Agreement shall be binding upon the Customer and/or successors, estates, executors, administrators, and assigns of the Customer. CUSTOMER AGREES THAT ANY CONTROVERSY BETWEEN BROKER AND CUSTOMER ARISING OUT OF THIS AGREEMENT, REGARDLESS OF THE MANNER OF RESOLUTION, SHALL BE ARBITRATED, LITIGATED (TRIED IN A COURT OF LAW), OR OTHERWISE RESOLVED BY A TRIBUNAL LOCATED IN CHICAGO, ILLINOIS. IN ADDITION, CUSTOMER HEREBY WAIVES TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING. Customer agrees to pay all expenses, including attorney's fees, incurred by Broker: (a) to defend any unsuccessful claim Customer brings against Broker or; (b) to collect any debit balances Customer account(s). No legal or administrative action arising out of this contract may be commenced by anyone more than ONE (1) year after any claim arises. The headings and titles herein are inserted for the convenience of reference only and are to be ignored in the construction of the provisions hereof.

**25. Agreement To Shorten Statutes Of Limitations.** FCM and Customer agree that no action in law, equity, arbitration or administrative proceeding, arising out of this agreement, any transactions effected pursuant to this agreement or the relationship of Customer with FCM, may be commenced more than ONE (1) year after the aggrieved party knew or should have known a cause of action existed. Customer acknowledges that he/she is expressly agreeing to waive the two year statute of limitations provided by the Commodity Exchange Act, including the two year time period for commencing a Commodity Futures Trading Commission reparation proceeding, and any and all other applicable statutes of limitations exceeding one year, including but not limited to, any statutory or common law state or federal statue of limitations, the statute of limitations provided by the National Futures Association for commencing an arbitration action, and the statute of limitations for initiating arbitrations before registered contract markets. Customer understands that the agreement with this paragraph is not necessary to open an account with FCM.

**26. Joint Account.** If this is a joint account, the Customers agree, jointly and severally, that the foregoing Agreement and all matters contained herein are the joint and several rights and obligations of the Customer. Each of the Customers has the authority to act on behalf of the joint account as if (s)he alone were interested therein all without notice to the others interested in said account, including but not limited to conferral or revocation of authority hereunder. All property of any one or more of the Customers held or carried by FCM shall be as collateral security and with a general lien thereon for the payment of all debits, losses or expenses incurred in the joint account and vice versa, however arising. In the event of death or legal incapacity of any of the customers, the survivor(s) immediately shall give PCM notice and FCM may, before or after receiving such notice, take such action, require such documents, retain such assets and/or restrict transactions as FCM deems advisable to protect FCM. Liability of the Customer hereunder shall pass to any estate or personal representative of the Customer. This joint account can be with or without the right of survivorship. "Without rights of survivorship" means upon death of any of the Customers the FCM will divide the joint account into separate equal accounts in each of the Customers' respective names, but Customers shall continue to be liable on the joint account hereunder until FCM has received actual notice of such death or incapacity. "With full rights of survivorship" means upon death of any of the Customers, the survivor(s) shall be vested with this joint account, subject to notice and ability as aforesaid. If no instruction is given on Page 7(b) of this Agreement, the Customers shall be deemed Joint Tenants with Full Rights of Survivorship.

Revised 08/2002

Customer's Initials _____

**27. Purpose of Lending Agreement and Lending Agreement.** Should Customer take delivery of commodities through futures contracts, FCM is obligated to make full payment for the delivery on 24 hours notice. If the balance in Customer's account is not adequate to pay for the delivery, the warehouse receipts representing the delivery become property carried on margin in Customer's account, since they are not fully paid for by Customer. The purpose of the lending agreement is to allow FCM to use the warehouse receipts as collateral for a bank loan, the proceeds of which are used to pay for the warehouse receipts until re-delivery of the commodity and/or payment in full by Customer. Customer hereby authorizes FCM from time to time to lend, separately or together with the property of others, either to itself or to others, any property which FCM may be carrying for the undersigned on margin. This authorization shall apply to all accounts carried by FCM for the undersigned and shall remain in full force until written notice of revocation is received by FCM at FCM's principal office.

**28. Trading Limitations.** FCM, at any time, in its sole discretion may limit the number of contracts of positions and/or the margin in use which the Customer may maintain or acquire through FCM. Customer agrees not to exceed the positions limits established by the CFTC or any contract market and/or limits of the number of contracts or positions and/or the margin in use set by FCM, whether acting alone or with others.

**29. Binding Effect.** This Agreement, including all authorizations, shall inure to the benefit of FCM, its successors and assigns and shall be binding upon Customer and Customer's personal representatives, executors, trustees, administrators, successors and assigns.

**30. Printed Media Storage.** Customer acknowledges and agrees that FCM may reduce all documentation evidencing Customer's account, including the original signatured documents executed by Customer in the opening of such Customer's account with FCM, utilizing a printed media storage device such as micro-fiche or optical disc imaging, Customer agrees to permit the records stored by such printed media storage method to serve as a complete, true and genuine record of such Customer's account documents and signatures.

**31. Options Trading.** Customer understands that some exchanges and clearing houses have established cut-off times for the tender of exercise instructions and that an option will become worthless if instructions are not delivered before such expiration time. Customer also understands that certain exchanges and clearing houses automatically will exercise some "in-the-money" options unless instructed otherwise. Customer acknowledges full responsibility for taking action either to exercise or to prevent the exercise of an option contract, as the case may be, and FCM is not required to take any action with respect to an option contract, including without limitation any action to exercise a valuable option prior to its expiration date or to prevent the automatic exercise option, except upon Customer's express instructions. Customer further understands the FCM has established exercise cut-off times which may be different from the times established by exchanges and clearing houses. Further, Customer understands that (i) all short option positions are subject to assignment anytime including positions established on the same day that exercises are assigned, and (ii) exercise assignment notices are allocated randomly from among all FCM Customers' short options positions which are subject to exercise. A more detailed description of FCM's allocation procedure is available upon request.

**32. Terms and Headings.** The term "FCM" shall be deemed to include FCStone, LLC its successors and assigns; the term "Customer" shall be deemed to refer to the party or parties executing this agreement. All pronouns shall be deemed to refer to the feminine or the masculine as the gender of Customer requires. If this is a joint account, the singular shall mean, where appropriate, all owners of an account and the statements, agreements, representations and warranties set forth herein shall be deemed to have been made by each owner of the account. The paragraph headings in this agreement are inserted for convenience of reference only and not intended to limit the applicability of affect the meaning of any of its provisions.

**33. Disclosure Statement for Non-Cash Margin.** This statement is furnished to you because rule 190.10(C) of the Commodity Futures Trading Commission requires it for reasons of fair notice unrelated to this Company's current financial condition.

1 . You should know that in the unlikely event of this Company's bankruptcy, property, including property specifically traceable to you, will be returned, transferred or distributed to you, or on your behalf, only to the extent of your pro rata share of all property available for distribution to customers.

2. Notice concerning the terms for the return of specifically identifiable property will be by publication in the newspaper of general circulation.

3. The commission's regulations concerning bankruptcies of commodity brokers can be found at 17 Code of Federal Regulations Part 190.

**34. Electronic Trading And Order Routing Systems.** Customer acknowledges that electronic trading and order routing systems differ from traditional open outcry pit trading and manual order routing methods. Transactions using an electronic system are subject to the rules and regulations of the exchange(s) offering the system and/or listing the contract that may change from time to time. Customer further acknowledges that trading or routing orders through electronic systems varies widely among the different electronic systems which may present different risk factors with respect to trading on or using a particular system including, but not limited to, system access, varying response times, and security. In the case of Internet-based systems, there may be additional types of risks related to system access, varying response times, security, as well as risks related to service providers and the receipt and monitoring of electronic mail. CUSTOMER AGREES TO INDEMNIFY FCM AND HOLD FCM HARMLESS FROM AND AGAINST ANY AND ALL LIABILITIES, LOSSES, DAMAGES, COSTS AND EXPENSES, INCURRED DIRECTLY OR INDIRECTLY, BY CUSTOMER BECAUSE OF FAILURE OF SYSTEM ACCESS, VARYING RESPONSE TIMES, SECURITY, SYSTEM OR COMPONENT FAILURE, THE INABILITY TO ENTER NEW ORDERS, EXECUTE EXISTING ORDERS, OR MODIFY OR CANCEL ORDERS THAT WERE PREVIOUSLY ENTERED AND/OR LOSS OF ORDERS OR ORDER PRIORITY.

Revised 08/2002

Page 7 of 8                                                      Customer's Initials

**ACCOUNT AUTHORIZATION AND TREATMENT OF FUNDS**

Customer authorizes at least two accounts (2) on the books of the FCM. One designated Regulated where all transactions designated as regulated by the Commodity Futures Trading Commission ("CFTC") will be carried, and the other designated Nonregulated where deliveries and/or transactions on foreign exchanges, if any, will be carried. FCM is hereby authorized to transfer funds as it deems necessary between these accounts. Further, if the Customer has more than one Regulated and/or Nonregulated account or has a joint account, from time to time, FCM, in its sole discretion and without prior notice to Customer, may apply or transfer (including segregated funds or other property) interchangeably between any of the Customer accounts at FCM or an affiliate of FCM as may be necessary for margin or to satisfy or reduce any deficit or debit balance in any Customer account.

_____  Date 4/15/07

Customer 1 Signature

_____  Date 4/15/07

Customer 2 Signature

_____  Date _____

Customer 3 Signature

The Customer hereby confirms to FCM that all orders which the Customer gives FCM for the purchase or sale of futures or options contracts for these account(s) will represent bona fide hedges, as defined by the Commodity Futures Trading Commission, against spot positions or commitments in accordance with 4a(3) of the Commodity Exchange Act, and with any amendments of CFTC interpretations which may be made in the future. Should the undersigned place orders for the purchase or sale of futures contracts which are not hedge transactions, the undersigned thereupon will advise FCM. IF THE LINE LABELED "LOB" BELOW IN THE ACKNOWLEDGEMENT SECTION IS INITIALED BY THE CUSTOMER, SHOULD A TRUSTEE IN BANKRUPTCY EVER BE APPOINTED IN THE FUTURE FOR FCM, THE CUSTOMER HEREBY CONFERS UPON SUCH TRUSTEE THE AUTHORITY TO LIQUIDATE OPEN COMMODITY CONTRACTS HELD IN THE BONA FIDE HEDGE ACCOUNT OF THE CUSTOMER WITHOUT SUCH TRUSTEE SEEKING THE PRIOR INSTRUCTIONS OF THE CUSTOMER AT THAT TIME. IF NO INITIALS APPEAR ON THE LINE BELOW, YOU WILL INDICATE ON YOUR RECORDS THAT SUCH AUTHORITY HAD NOT BEEN CONFERRED UPON A TRUSTEE IN BANKRUPTCY, IF ONE IS EVER APPOINTED.

List Commodities to be Hedged: _____

_____

**ACKNOWLEDGEMENT OF RECEIPT OF COMMODITY FUTURES TRADING COMMISSION DISCLOSURE STATEMENTS AND/OR ELECTIONS.**

BY INITIALING THE LINE NEXT TO THE DESCRIPTION OF THE SPECIFIED DISCLOSURE STATEMENT AND/OR ELECTION, YOU ACKNOWLEDGE THAT YOU HAVE RECEIVED, READ AND UNDERSTAND THE SPECIFIED DISCLOSURE STATEMENT OR HAVE MADE THE ELECTION.

NOTE: ALL SIGNATORIES TO THE CUSTOMER ACCOUNT AGREEMENT MUST INITIAL WHERE APPROPRIATE.

SK   RW   _____ I (we) acknowledge receipt of the Risk Disclosure Statement for Futures and Options.   (Receipt must be acknowledged before an Account may be opened.)

_____, _____, _____, LOB-I (we) grant authority to have open positions liquidated as delineated above in the section titled "For Hedge Customers Only-Hedge Confirmation Letter."

**Customer(s), the undersigned, hereby acknowledge receiving, reading and understanding the provisions of the Customer Account Agreement and agree by those provisions.**

_____  Date _____

Customer 1 Signature

_____  Date _____

Customer 2 Signature

_____  Date _____

Customer 3 Signature

Revised 01/2002